E-FILED
Thursday, 11 January, 2018  08:23:04 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NICOLE "NIKKI" BOGART, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv-01088-CSB-EIL |
| | ) | |
| vs. | ) | Hon. Judge Colin Stirling Bruce |
| | ) | |
| MICHAEL MARRON, individually and | ) | Hon. Magistrate Judge Eric I. Long |
| in his official capacity as Vermilion County | ) | |
| Board Chairman, and VERMILION | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE IN OPPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

 Plaintiff Nicole "Nikki" Bogart ("Bogart"), by and through her attorney, Kevin F. O'Connor of

O'Connor | O'Connor, P.C., submits her response in opposition to Defendants' Motion for Summary

Judgment, and states as follows:

### <u>INTRODUCTION</u>

In determining whether public employees may be discharged because of their political

affiliation, the ultimate inquiry is not whether the label "policymaker" or

"confidential" fits a particular position, rather, the question is whether the hiring

authority can demonstrate that party affiliation is an appropriate requirement for the

effective performance of the public office involved. By focusing solely on whether

Ms. Bogart's job position fits within the policy maker or confidential labels,

Defendants failed to establish that political loyalty was required for Plaintiff's

position. There is ample evidence showing that political affiliation was not required

for the Financial Resources Director position and that Plaintiff's role and authority

were passive and limited. Further, the County's own policy banning adverse

employment action based on political patronage cast additional light on the nature of

Plaintiff's job.

The question of whether a position is exempted from the First Amendment patronage

dismissal ban is a factual one that should ordinarily be left for a jury to determine.

There is genuine issue of material facts that precludes summary judgment motion as

to whether political affiliation was required for Plaintiff's position as FRD.

Accordingly, Defendants' Motion for Summary Judgment should be DENIED.

Further, Defendant Marron is not entitled to qualified immunity because it is clearly

established under both the U.S. and Illinois Constitutions that termination based on

political belief is unlawful.

## RESPONSE TO UNDISPUTED MATERIAL FACTS

### Undisputed Material Facts

1.      Plaintiff Nikki Bogart was the Financial Resources Director ("FRD") from July

2, 2007, until January 30, 2015 (Ex. A, Answer to Am. Compl., ¶¶ 8, 23).

**Plaintiff does not contest.**

2.      Plaintiff is a Democrat and unsuccessfully ran for County Recorder in 2012 (Ex.

A, Answer to Am. Compl., ¶ 14; Ex. B, Pl. Dep., p. 14).

**Plaintiff does not contest.**

3.      Defendant Mike Marron was elected Vermilion County Board Chairman by the

County Board on December 2, 2014 (Ex. A, Answer to Am. Compl., ¶ 22).

**Plaintiff does not contest.**

4.      Defendant Marron is a Republican (Ex. C, Marron Dep., pp. 8-9).

**Plaintiff does not contest.**

6.      In July 2007, McMahon hired Plaintiff as the FRD (Ex. B, Pl. Dep., pp. 12-13;

Ex. D, McMahon Dep., pp. 8-9).

**Plaintiff does not contest.**

8.     Plaintiff's employment offer stated that her employment will be considered at-will

(Ex. B, Pl. Dep., pp. 18-19; Ex. D, McMahon Dep., p. 16).

**Plaintiff does not contest.**

11.      In December 2012, the Republicans took control of the County Board, and Gary

Weinard became County Board Chairman (Ex. E, Weinard Dep., pp. 5, 16).

**Plaintiff does not contest.**

12.      Weinard is a Republican (Ex. E, Weinard Dep., p. 28).

**Plaintiff does not contest.**

13.      Weinard testified that Republican Board members, Chuck Mockbee and Dennis

Miller, wanted Weinard to get rid of all the Democrats in the County Board Office, but he

declined to do so (Ex. E, Weinard Dep., pp. 16-18, 33-34).

**Plaintiff does not contest.**

14.      Defendant Marron was the County Board Vice Chairman from 2012 to

2014 while Weinard was Chairman (Ex. A, Answer to Am. Compl., ¶ 16).

**Plaintiff does not contest.**

15.     Plaintiff's duties did not change from 2012 through the end of 2014 (Ex. B, Pl. Dep., p. 49).

**Plaintiff does not contest.**

17.     Weinard resigned as Chairman effective on December 31, 2014, and Defendant Marron was elected County Board Chairman by the County Board (Ex. A, Answer to Am. Compl., ¶ 22; Ex. E, Weinard Dep., p. 26).

**Plaintiff does not contest.**

18. Marron terminated Plaintiff's employment as FRD on January 30, 2015 (Ex. A, Answer to Am. Compl., ¶ 23; Ex. C, Marron Dep., pp. 11-21).

**Plaintiff does not contest.**

19.     In 1985, the County Board restructured the County Board Office to have a fulltime Chairman, Human Resource Manager, Financial Resource Manager, Clerk/Typist II, and Executive Secretaries (Ex. F, Resolution 85-115 and attachments).

**Plaintiff contests this statement to the extent it relies on Ex. F, which Plaintiff objects to because it cannot be authenticated, and it is hearsay.**

20. The County Board approved an organization chart for the County Board Office, incorporated into Resolution 85-115, which placed the Financial Resource Manager directly under the Finance Committee, a sub-committee of the County Board (Ex. F, Resolution 85-115 and attachments).

**Plaintiff contests this statement to the extent it relies on Ex. F, which Plaintiff objects to because it cannot be authenticated, and it is hearsay.**

21. At the end of 2014, when Marron became Chairman, the County Board Office had six full-time employees: the Chairman, the Human Resource Manager (Nancy Boose), the Payroll Clerk (Nancy Brumfield), the Executive Secretary (Terrie Sherer), the Civil Attorney (Bill Donahue) and the FRD (Plaintiff) (Ex. B, Pl. Dep., p. 55; Ex. E, Weinard Dep., p. 7).

**Plaintiff does not contest.**

22. The 2007 Position Classification Description, which was in effect when Plaintiff was hired, describes the job duties of the FRD and requires the FRD to report directly to the County Board Chairman and work at the direction of the Chairman. Plaintiff admitted she reported to the Chairman and worked at his direction (Ex. B, Pl. Dep., pp. 19-20; Ex. D, McMahon Dep., pp. 22-23; Ex. G, 2007 Position Classification Description).

**Plaintiff contests this statement to the extent it relies on Ex. G, which Plaintiff objects to because it cannot be authenticated, and it is hearsay.**

23. The 2007 Position Classification Description includes duties such as assisting the Finance Committee in their meetings and ensuring that information about the County's finances is available to all Board members. Plaintiff admitted she did this when she was the FRD (Ex. B, Pl. Dep., p. 20; Ex. D, McMahon Dep., p. 23; Ex. G, 2007 Position Classification Description).

**Plaintiff contests this statement to the extent it relies on Ex. G, which Plaintiff objects to because it cannot be authenticated, and it is hearsay.**

24. The 2007 Position Classification Description requires the FRD to work with the County Treasurer, Auditor, and other department heads and elected officials in the day-today operations of the County so as to comply with generally accepted

accounting practices and procedures as adopted by the Vermilion County Board.

Plaintiff did this when she was the FRD (Ex. B, Pl. Dep., p. 20; Ex. D, McMahon

Dep., p. 23; Ex. G, 2007 Position Classification Description).

**Plaintiff contests this statement to the extent it relies on Ex. G, which Plaintiff**

**objects to because it cannot be authenticated, and it is hearsay.**

25.     It is crucial that the FRD have a good working relationship with the

County Auditor and Treasurer, two elected officials, so all the finances go smoothly

(Ex. D, McMahon Dep. pp. 12-13).

**Plaintiff does not contest.**

26.     The 2007 Position Classification Description includes illustrative

examples of the FRD's work such as:

- developing long and short-range financial plans involving revenue and expenditure projections;

- conducting budget preparation, review and control, and preparing the final year budget for adoption and public review;

- exercising on-going budget analysis by tracking expenditures and reviewing requests for line item transfers;

- assisting in the operation of County purchasing policies;

- coordinating the preparation of bid specifications;

- coordinating the County accounting system including revenue, expenditures, and entries;

- reviewing grant applications funded with Federal funds through State agencies to determine compliance with applicable regulations; and

- performing other duties as assigned.

(Ex. B, Pl. Dep., pp. 19, 22-29; Ex. D, McMahon Dep., pp. 22-26; Ex. G, 2007 Position Classification Description).

**Plaintiff contests this statement to the extent it relies on Ex. G, which Plaintiff objects to because it cannot be authenticated, and it is hearsay.**

30. Plaintiff facilitated the creation of the County's $42 million budget (Ex. B, Pl. Dep., p. 187).

**Plaintiff does not contest.**

32. The FRD helps the Chairman prepare the budget and maintain budget accuracy throughout the following year and is the accounting side of the County Board Office (Ex. D, McMahon Dep., pp. 13-14).

**Plaintiff does not contest.**

33. Former Chairman Weinard required Plaintiff to draft a document listing her duties as FRD in 2012 (Ex. B, Pl. Dep., pp. 39-41; Ex. E, Weinard Dep., pp. 7-8; Ex. H, Duties of FRD).

**Plaintiff does not contest.**

34. In response, Plaintiff listed the following duties:

- Conducts budget preparation, review and control. Prepares the fiscal year budget for public review and adoption, including creating 23 of the County's 109 budgets and monitors those budgets monthly, analyzing all 109 budgets and communicates concerns, changes, and historical data to the County Board Chairman, the Finance Committee Chairman, and Auditor, and scrutinizes expenditures, continually seeking out savings and revenue opportunities.

- Coordinates the County's annual independent audit, including scheduling, preparing audit schedules and confirmations, and generally assisting in the process.

- Prepares the annual Management Discussion and Analysis report to analyze the financial health of the County and to explain the audit results.

- Oversees the County's insurance programs and maintains insurance policies, including preparing and distributing invoices to various departments for participation in funding various expenses such as workers' compensation, general liability, and unemployment insurance, and prepares monthly reconciliation of member payments and insurance charges for the County's Health Insurance Program, and distributes monthly invoices to collect funding from various sources.

- Prepares monthly invoices and processes rent and maintenance payments for the Danville Public Building Commission for reimbursement of Public Safety Building and Juvenile Detention Center expenses.

- Tracks/Invoices salary reimbursements that are General Fund Revenue for the Public Defender, Probation, Juvenile Detention Center, State's Attorney, Supervisor of Assessments, and Workforce Investment Board.

(Ex. B, Pl. Dep., pp. 41-49; Ex. H, Duties of FRD)

**Plaintiff does not contest.**

35. Weinard testified that Plaintiff completed all of these duties as FRD (Ex. E, Weinard Dep., pp. 8-9, 11, 13-14).

**Plaintiff does not contest that it was Mr. Weinard's testimony, but *see also* Plaintiff's Additional Statement of Facts (PASF) ¶ 2.**

36. The Chairman relies on the FRD's ability and expertise to complete the duties outlined in the Duties of FRD document (Ex. B, Pl. Dep., pp. 44-45, 47-48).

**Plaintiff does not contest.**

38. Weinard testified that Plaintiff, in her role as FRD, had a lot of input in the

direction of the County budget (Ex. E, Weinard Dep., p. 11).

**Plaintiff does not contest that it is Mr. Weinard's testimony, but** *see also* **Plaintiff's Additional Statement of Facts (PASF) ¶¶ 2, 3, and 11.**

40. The FRD is a confidential position in relation to the Chairman (Ex. E, Weinard

Dep., p. 14).

**Plaintiff does not contest that it is Mr. Weinard's testimony.**

41. The FRD serves as the finance advisor to the Chairman and the County Board

(Ex. C, Marron Dep., pp. 24-25; Ex. E, Weinard Dep., p. 12).

**Plaintiff does not contest that this is the witnesses' testimony.**

42. Defendant Marron described the FRD's duties to include meeting with department heads

to develop their budgets, helping the Chairman craft the County budget, and implementing tax

strategies. The FRD is instrumental in the formulation of the Board Office's policy concerning the

budget, and is the Chairman's chief policy advisor (Ex. C, Marron Dep., p. 25).

**Plaintiff does not contest that it is Defendant Marron's testimony.**

44.    The Vermilion County Personnel Policies and Procedures ("County

Personnel Policies") was approved by the County Board in 1991 and revised in 2006

(Ex. I, County Personnel Policies).

**Plaintiff does not contest that this is what the document sets forth.**

45.    The County Personnel Policies were provided to County employees "as

a tool to communicate personnel policies and procedures and provides a source of

authority for reference and guidance" (Ex. I, County Personnel Policies, p. 1).

**Plaintiff does not contest that this is what the document sets forth.**

46.     The County Personnel Policies state: "[u]nless exempted by County ordinance, union contracts, federal or state statute, all persons engaged in County service are subject to these policies and procedures, including department/agency heads, officeholders and administrative personnel" (Ex. I, County Personnel Policies, p. 1).

**Plaintiff does not contest that this is what the document sets forth.**

47.     The County Personnel Policies further state in bold print: "This is not intended to create a contract of employment but is a policy and information guide to guide employees" (Ex. I, County Personnel Policies, p. 1).

**Plaintiff does not contest that this is what the document sets forth.**

48.     The County Personnel Policies contain several anti-discrimination and equal opportunity employment statements (Ex. I, County Personnel Policies, pp. 4, 5, 37)

**Plaintiff does not contest that this is what the document sets forth.**

49.     Although the County Personnel Policies do not have a definitions section, Article 4 is entitled "Employee Classifications" and includes classifications for appointed and elected officials, including the Chairman (Ex. I, County Personnel Policies, p. 13-15).

**Plaintiff does not contest that this is what the document sets forth.**

50.     The County Personnel Policies, Article 14.01, states that:

> "No employee of Vermilion County shall be subject to direct or indirect political influence or coercion. Employees are not required to participate in or contribute financially to political campaigns. Political affiliation or support is not a contingency for employment in Vermilion County."

(Ex. I, County Personnel Policies, p. 47).

**Plaintiff does not contest that this is what the document sets forth.**

## Disputed Material Facts

9.    McMahon testified as to the importance of Plaintiff's involvement in his administration, stating that he "couldn't keep from raising your taxes six years in a row without Nikki" and that he would not have been able to run a multi-million dollar government and not raise taxes without her (Ex. D, McMahon Dep., pp. 19, 28).

**Plaintiff contests because it misconstrues the witness's testimony. The witness was testifying as to why he did not agree with Defendants' decision to terminate Plaintiff, not as to the importance of Plaintiff's involvement in his administration.**

27.    Plaintiff admitted that she participated or was involved in some of the illustrative examples listed on the Position Classification, including: developing long and short-range financial plans involving revenue and expenditure projections; conducting budget preparation, review and control and preparing the final year budget for adoption and public review; and, exercising on-going budget analysis by tracking expenditures and reviewing requests for line item transfers (Ex. B, Pl. Dep., pp. 22-29).

**Plaintiff contests that this statement misconstrues witness's testimony because Ms. Bogart clearly testified that she did not control the budget.  *See* PSAF ¶ 2.**

28.    Former Chairman McMahon testified that Plaintiff was involved in all of the illustrative examples listed on the 2007 Position Classification Description and was additionally responsible for the finance side of developing the County's health insurance program (Ex. D, McMahon Dep., p. 22-28).

**Plaintiff contests this statement as incomplete because Mr. McMahon testified that Plaintiff needed help from the Auditor when performing certain duties. (Def. Ex. D, McMahon Dep. 25:3-9)**

29.     Plaintiff testified that her other duties included annual budget preparation, participation in the annual audit, and overseeing the County's insurance policies (Ex. B, Pl. Dep., pp. 30-31, 45-46).

**Plaintiff contests this statement as incomplete.** *See* **PSAF ¶¶ 2 and 3.**

31.     Plaintiff was responsible for preparing the budget for 25 or 26 County funds, such as Animal Control, Building and Grounds, EMA, workers' compensation, and liability insurance (Ex. B., Pl. Dep., pp. 22-23, 187)

**Plaintiff contests this statement as incomplete.** *See* **PSAF ¶¶ 2 and 3.**

37.     The Chairman relies on the information provided by the FRD in order to determine whether he will accept a tax increase or not, or a deficit or not (Ex. B, Pl. Dep., pp. 43- 44; Ex. E, Weinard Dep., p. 9).

**Plaintiff contests this statement as incomplete.** *See* **PSAF ¶ 11.**

39.     It is important for the Chairman to be able to trust the FRD (Ex. E, Weinard Dep., p. 12; Ex. B, Pl. Dep., p. 45, 102).

**Plaintiff contests this statement as incomplete because Ms. Bogart was testifying as to the Chairman's trust in FRD's ability to provide accurate information. (Def. Ex. B, Pl. Dep., 45:12-16, 101:19-102:17).**

43. In addition to her other duties, Plaintiff oversaw the County's insurance programs and maintained the insurance policies, and had "significant input into the development of the health insurance program" (Ex. B, Pl. Dep., pp. 45-46; Ex. D, McMahon Dep., pp. 26-28; Ex. E, Weinard Dep., p. 13).

**Plaintiff contests this statement as incomplete because the witnesses testified that she was only responsible for the financial side of the health insurance program and other employees at the County Board office contributed to the development of the health insurance program. (Ex. D, McMahon Dep., pp. 26-28).**

## Disputed Immaterial Facts

10.    McMahon explained that Defendant Marron, then a County Board member, was the only person on the Board who voted against McMahon's proposed budget which was prepared by Plaintiff (Ex. D, McMahon Dep., pp. 24, 31).

**Plaintiff contests because it misconstrues the witness's testimony. Mr. McMahon generally explained Plaintiff's duty as a financial resources director when her was the chairman in p. 24 of his deposition, and then stated that Defendant Marron was "the only guy who voted no against my budget." (Ex. D, McMahon Dep., p. 31). This testimony is immaterial since it neither supports nor defeats Plaintiff's claims.**

## Undisputed Immaterial Facts

5.    In 2007, former Vermilion County Board Chairman Jim McMahon fired Tina Cravens, who had done some work for the Republican Party, from the FRD position (Ex. B, Pl. Dep., pp. 15-17; Ex. D, McMahon Dep., pp. 10-11).

**Plaintiff does not contest that Chairman McMahon fired Tina Cravens, but states that this statement of fact is not relevant to the subject matter of this suit because Chairman McMahon's personnel action has nothing to do with Plaintiff's claim and Ms. Cravens was terminated because of her incompetence, not because of her political affiliation. (Def. Ex. B, Pl. Dep., pp. 15:15-16:15; Def. Ex. D, McMahon Dep., pp. 10-11, Ex. B, Anstey Dep., 27:12-28:5).**

7.    McMahon was a member of the Democratic Party and knew that Plaintiff previously served on the County Board as a Democrat (Ex. D, McMahon Dep., pp. 5, 17).

**Plaintiff does not contest, but states that Mr. McMahon's hiring of Plaintiff is not based on political affiliation (Ex. B Anstey Dep. 12:11-13:15) and Mr. McMahon's hiring practice is irrelevant to this instant action.**

16.     In 2013, under Weinard's stewardship, there was a tax increase based on information provided by Plaintiff to Weinard (Ex. E, Weinard Dep., p. 9-10).

**Plaintiff does not contest that there was a tax increase in 2013, but states that Plaintiff did not have any control or authority over the tax increase. See also Def. Ex. B. Pl. Dep., 22:8-17. This fact is immaterial because it is irrelevant to Plaintiff's claim and Plaintiff did not cause the tax increase. (Def. Ex. B. Pl. Dep., 36:12-37:1.)**

### Plaintiff's Statement of Additional Material Facts

1.  Plaintiff, as FRD, reported to and performed work at the direction of the County Board Chairman; assisted the Finance Committee in their meeting and ensure that information about the County's finances is available to Board members; and assisted and cooperated with treasurer and auditor and other department heads and elected officials in the day-to-day operations of the County so as to comply with generally accepted accounting practices and procedures as adopted by Vermilion County Board.  (Def. Ex. B, Pl. Dep., P.20).

2.  As a FRD, Plaintiff did not control the budget. She put the budget together which went to the Finance Committee. The Committee altered the budget at its pleasure, Plaintiff inserted the changes, and presented it as many times as it took for the committee to approve it. Then the full County Board had authority to approve the final budget. (Def. Ex. B, Pl. Dep., p. 22).

3.  While she prepared the budgets that were general to the County, elected officials and department heads, not Plaintiff, were responsible for their own budgets. (Def. Ex. B, Pl. Dep., 22:18-25:9).

4. Plaintiff neither assisted in the operation of the County purchasing policies nor coordinated the preparation of bid specifics as she worked as FRD. Plaintiff did not coordinate the County accounting system which would include revenue, expenditures, and entries. (Def. Ex. B, Pl. Dep., 26:23-28:16).

5. The journal entries were completed by the Auditor. The Treasurer made entries into the accounting system.  (Def. Ex. B, Pl. Dep., 28:10-16).

6. Plaintiff did not review grant applications funded with Federal funds through State agencies to determine compliance with applicable regulations. (Def. Ex. B, Pl. Dep., 28:17-22).

7. FRD helped prepare budgets, and tracked revenues to make sure that the revenue came in, but did not even have access to basic information such as county's cash balance. (Pl. Ex. E. Anstey Dep. 29:7-16)

8. The Auditor was responsible for the expenses and balanced them with the budget. (Pl. Ex. E. Anstey Dep. 29:7-16).

9. The Treasurer's office had control over the cash balances in the County's accounts, wrote checks, and reconciled the accounts. (Pl. Ex. E. Anstey Dep. 29:7-16).

10. FRD is not a partisan job. (Def. Ex. C, Weinard Dep., 17:21-23).

11. The Board Chairman relies on FRD to compile the information for budgets, but it is the Chairman who gives directives to FRD as to how he wants the budgets, i.e., if he will accept a tax increase or deficit. (Def. Ex. B Pl. Dep., 43:11-44:3).

12. The County Board Chairman has the authority to draft budgets, set budgetary goals, and approve budgets before they are sent out to various County committees for approval. (Def. Ex. E, Weinard Dep., 42:6-12).

13. FRD performs her duties related to the County budget in accordance with the Chairman's direction. (Def. Ex. E, Weinard Dep., 42:17-23).

14. FRD does not have the power to make County policies nor did that position grant broad discretion over the County budget or financial planning. (Def. Ex. E, Weinard Dep., 43:1-6).

15. Ms. Bogart, in her position as FRD, did not have any power to thwart or block the political goals of the County Board Chairman or those of the Republican Party. (Def. Ex. E, Weinard Dep., 44:3-8).

16. Mr. Weinard, the former Republican Board Chairman right before Defendant Marron, testified that Plaintiff's political affiliation did not interfere with her ability to do the job. (Def. Ex. E, Weinard Dep., 45:5-11).

17. Mr. Weinard also testified that being the same political party as the Chairman of the Board was not a requirement for the position of FRD. (Def. Ex. E, Weinard Dep., 44:9-23).

18. Since he started his term as the Board Chairman, Mr. Weinard told Plaintiff and other County employees on numerous occasions that Defendant Michael Marron was pressuring him to terminate Plaintiff. (Def. Ex. B Pl. Dep., pp.55, 65-69, Pl. Ex. A, Turner Affidavit ¶ ¶ 7 and 9, Pl. Ex. B Anstey Declaration ¶ 6, Pl. Ex. D. Brumfield Dep., 35:21-40:16, 42:14-19).

19. Mr. Weinard also stated to Mr. Garry Block and Ms. Linda Anstey, the Auditor, that he was getting a lot of pressure to terminate Plaintiff. (Def. Ex. B, Pl. Dep., p. 165:3-9, Pl. Ex. C. Block Dep. 18:20-19:8, 22:17-23, Pl. Ex. E. Anstey Dep., 64:9-67:21)

20. There were at least two other Republican board members pressuring Mr. Weinard to terminate Plaintiff, who wanted to clean house and get rid of Democrats in the County Board Office after the Republicans took control of the County Board.  (Def. Ex. C, Weinard Dep., 16:21-17;17). He told Defendant Marron that he was approached by them in regard to Ms. Bogart's termination, but he had no intention to dismiss anyone. (Def. Ex. C, Weinard Dep.,19:15-20:3).

21. It was a general and routine practice of the County Board that Plaintiff make a transfer of fund without prior approval when the Auditor gives notification of an overdrawn account. (Def. Ex. B, Pl. Dep., pp. 145, 156:5-10, Pl. Ex. B Anstey Declaration ¶¶ 4-5).

22. Monitoring and notifying regarding overdrafts of the County accounts are the duties of Treasurer's, not of FRD's. (Pl. Ex. E. Anstey Dep., 29:7-16).

23. One of the alleged reasons for Plaintiff's termination is, inter alia, that she had issued a check to transfer money without permission on January 30, 2015. (Def. Ex. B, Pl. Dep., p 149:3-7, Def. Ex. C, Marron Dep., 22:8-14, Pl. Ex. E. Anstey Dep. 23:22- 24:13, 25:8-13).

24. On January 30, 2015, pursuant to the County's usual practice, Plaintiff brought the manual check form to Linda Anstey, the Auditor, so that the Auditor could

sign the authorization that it was okay to issue a manual check after being notified of an overdrawn account. Plaintiff had to bring it to the Auditor because she did not have the ability to authorize the check, and the Treasurer's office would not issue a manual check without Ms. Anstey's signature. (Pl. Ex. E. Anstey Dep.45:20-48:10, 47:16-23).

25. At the time Ms. Bogart wrote the check for the transfer, the Auditor's office had a sheet of paper that Defendant Marron signed giving her permission to transfer money between the budges using her signature, and Plaintiff was authorized to transfer money from one budget to another without the Chairman's approval. (Pl. Ex. E. Anstey Dep., 55:9-57:23).

26. FRD is authorized to make the transfer without prior approval because of the signed permission sheet, and the transfer between budgets would go through unless the Chairman does not approve the transfer. (Pl. Ex. E. Anstey Dep., 59:12:9-61:8).

27. After Defendant Marron took office as County Board Chairman, employees in his office and other offices he had some influence over, who belonged to or supported the Democratic Party were removed from their position, either due to firings or because the working environment became such that they were forced to quit. (Pl. Ex. B, Anstey Declaration ¶ 7)

28. Defendant Michael Marron called Ms. Nancy Brumfield, a former payroll clerk at the County Board, into his office right after terminating Plaintiff. During this meeting, Defendant Marron told her that he took personally the fact that Plaintiff ran against Republican Tom O'Shaughnessy, as he [Marron]

was the chairman of the Republican party. (Pl. Ex. D, Brumfield Dep., pp. 35:11-18, 53:21-56:11)

29. One of the propounded reasons why Ms. Bogart was terminated was insubordination. (Pl. Ex. F, Defendants' Response to Requests to Admit ¶ 3).

30. After Ms. Bogart was terminated, the County had four FRDs. (Def. Ex. C. Marron Dep., 101:18-102:2).

31. Between November 2015 and June 2016, there was no one serving as FRD for Vermilion County. (Def. Ex. C. Marron Dep., 111:6-7, 112: 1-17). The County did not place any job posting and held off replacing the FRD position for a while because they wanted to see if they could consolidate positions and save some money. (Def. Ex. C. Marron Dep., 112:22-113:4).

32. Two of the people who were employed as FRD after Ms. Bogart were fresh out of college in their early 20s. (Def. Ex. C. Marron Dep., 107:3-109:12, 116:6-20).

33. Defendant Marron held many elected positions and worked on the County Board for many years. He also worked with Ms. Bogart before he became the Board Chairman. (Def. Ex. C. Marron Dep., pp. 9-10, 22:25-24:23).

34. Defendant Marron became familiar with the County's personnel policies after he became the Board Chairman. (Def. Ex. C. Marron Dep., 26:19-22).

35. Defendant Marron are also familiar with the fact that public employees have certain rights within the workplace, and the fact that the First Amendment rights in the U.S. and Illinois State Constitutions grant the right to rub for a political office. Defendant Marron further testified that he recognized that for a

government employer to terminate a government employee for running for

political office would be unlawful. (Def. Ex. C. Marron Dep., p. 27).

## ARGUMENT

### I.       Defendants waived the *Elrod-Branti* exception affirmative defense.

Federal Rule of Civil Procedure 8(c) requires a defendant to raise affirmative defenses in

his or her answer. *Williams v. Lampe,* 399 F.3d 867, 870–71 (7th Cir.2005).

Affirmative defenses not included in the answer are considered waived. *Marcus v.*

*Sullivan,* 926 F.2d 604, 615 (7th Cir.1991).


Here, Defendants failed to include the *Elrod-Branti* exception as an affirmative defense

in their Answer. *See* Def. Ex. A, Answer. Accordingly, Defendants should be barred

from raising the *Elrod-Branti* exception in their summary judgment motion.


### II.      Defendants fail to establish that party or political affiliation is an appropriate requirement for FRD position.

Unless the government can demonstrate "an overriding interest of vital importance", requiring

that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the

sole basis for depriving him of continued public employment. *Branti v. Finkel*, 445 U.S. 507,

515-516 (1980). In determining whether public employees may be discharged because of their

political affiliation, the ultimate inquiry is not whether the label "policymaker" or "confidential"

fits a particular position; rather, the question is whether the hiring authority can demonstrate that

party affiliation is an appropriate requirement for the effective performance of the public office

involved. *Id.* at 518.

Accordingly, the Seventh Circuit reversed a district court's decision to granting Defendant's summary judgment motion when the defendant ignored the broader and determinative question of whether party or political affiliation is an appropriate requirement for the job, and focused solely on whether plaintiff's job position fits within the "policy maker" or "confidential" labels. *Carlson v. Gorecki*, 374 F. 3d 461, 465 (7th Cir. 2004). The Court found that a genuine issue of material fact precluded summary judgment because a supervisor of the terminated plaintiffs indicated that political affiliation was not important to the job. *Id.* The Seventh Circuit also held that it is possible to infer from defendant's decision to eliminate the plaintiff's position not only that it was a non-patronage job, but also that the position was not important at all for the functioning of the office. *Id.*

Here, Defendants focus their analysis and argument solely on whether Ms. Bogart's position as the FRD falls under the policymaker or confidential labels. However, they miserably fail to show that party affiliation is an appropriate requirement for the effective performance of Plaintiff's position. To the contrary, there is ample evidence for a jury to conclude that the political affiliation was not important to the FRD position at all.

First, Mr. Gary Weinard, the former Board Chairman and Plaintiff's direct supervisor for two years, clearly testified: that FRD is not a partisan job; FDR does not have the power to make County policies nor did that position grant broad discretion over the County budget or financial planning; Ms. Bogart did not have any power to thwart or block the political goals of the County Board Chairman or those of the Republican Party; and being the same political party as the

Chairman of the Board was not a requirement for the position of FRD.  (PSAF ¶¶10, 14, 15, 16, and 17).

Second, Defendants did not even bother to fill the FRD position for more than six months between November 2015 and June 2016 (PSAF ¶ 31). After Plaintiff's replacement in the FRD position left the job, the County did not place a job advertisement and held off filing the FRD position because the County wanted to see if it could consolidate positions and save money. *Id*. Further, Defendants hired two people for the position who were fresh out of college, and not suitable to fill a position that would have placed them in a "policymaking" role for the entire County. (PSAF ¶ 32). From these facts, it can be inferred that the FRD position was neither an integral part of the County Board Office nor a chief advisor to the Chairman with policymaking or policyshaping authority as Defendants attempt to make it appear.

The FRD position does not fall under the *Elrod-Branti* exception and Defendants' Motion for Summary Judgment should be denied.

### III.    The Financial Resources Director position is not a policy making position as a matter of law, and the question should be decided by the jury.

#### 1.  The job description is not clear enough to warrant summary judgment.

The question of whether a position is exempted from the First Amendment patronage dismissal ban is a factual one that should ordinarily be left for a jury to determine. *Matlock v Barnes*, 932 F.2d 658 at 663, 665 (7th Cir. 1991) (finding determination of plaintiff's policymaking and confidential status properly left to jury when the accurate determination of the exact nature of the duties were impossible to determine based on the summary judgment motion); *Soderbeck v.*

*Burnett County, Wis.*, 752 F.2d 285, 288–89 (7th Cir.1985) (finding that when the question of whether a position involves policymaking is "sufficiently uncertain" it is properly left to the jury).

Only in limited cases where the duties and responsibilities of a particular position are clearly outlined in an official job description may a court make such a determination as a matter of law. *Pleva v. Norquist*, 195 F. 3d 905 at 912 (7th Cir. 1999). However, not every political patronage case can be resolved just by reading the job description, as the description might leave the reader unclear whether the job confers any policymaking or confidential discretion, and then additional evidence would be necessary. *Id*. In those instances, summary judgment would not be appropriate. *Allman v. Smith*, 6 F. Supp. 3d 889 (S.D. Ind., March 13, 2014). The Court must determine if it is clear from the job descriptions whether each plaintiff held a job for which political affiliation is an appropriate prerequisite for effective performance. *Id*. The court further looks at "whether the position entails the exercise of a substantial amount of *political* (as distinct from professional) discretion." *Powers v. Richards*, 549 F.3d 505, 510 (7th Cir. 2008) (emphasis original). In general ... employees whose discretion is channeled by professional rather than political norms ... are not within the exception for policymakers. *Riley v. Blagojevich*, 425 F.3d 357, 360 (7th Cir. 2005).

The instant case certainly is not a case that could be resolved by just reading job description. First of all, the two job descriptions Defendants heavily depend on are not reliable in that one of them is at least 10 years old (Def. Ex. G) and there is no evidence the other one prepared by Ms. Bogart at Mr. Weinard's direction became an official one. Further, the job description is  vague

and the job descriptions themselves do not establish that Plaintiff's position required her exercise

political judgment or provide political advice to the elected position. On the contrary, Plaintiff

provided professional judgment and information as an accountant by preparing budgets in

accordance with the Board Chairman's own policy goals (PSAF ¶¶ 11-14).

Further, the evidence shows that Plaintiff did not have any discretion or authority as to the

budget planning.  Since the Finance Committee altered the budget at its pleasure even after she

submitted the information, Ms. Bogart had to amend the budget to reflect the changes made by

the Committee, and presented it as many times as was needed until it was approved by the

Committee (PSAF ¶ 2). In addition, Plaintiff was only responsible for preparing numbers for

budgets that were general to the County, and each elected official or department head was

responsible his or her own budget (PSAF ¶ 3).

Looking at the text of the description alone, a reasonable inference can be drawn that the position

does not involve policymaking. Because this is a summary judgment motion, and all reasonable

inferences must be drawn in favor of the Plaintiff, this inference precludes summary judgment as

to this issue. *See Carlson v. Gorecki*, 374 F. 3d 461 (2004).

## 2.  **The Financial Resources Director position had limited and passive role**.

Defendants' argument that a position that involves finances, accounting, and budgeting makes it

a policymaking position also fails. The Court has found that plaintiffs with such duties held a

policymaking position only when they were high ranking officers; were responsible for

establishing fiscal procedure; suggested or advised solutions for possible financial problems;

supervised 30-40 employees; managed budgets of several million dollars; were appointed by a

politician; regularly interacted with legislators; or their political connection was a primary a qualification to hold the position. *See Allen v. Martin*, 460 F. 3d 939 (7th Cir. 2006) (IDOT Bureau Chief was a policy maker because he established fiscal control procedures, directed audits which can be used politically, suggested solutions to the administration for possible problems, and played an important role in representing the IDOT in a larger political context); *Embry v. City of Calumet City, Ill*, 701 F. 3d 231 (Commissioner of a city department of streets and alleys was a policymaker because he held the department's highest position, managed four million dollar budget, had high-level responsibility to thwart the political goals of the party in power, and was appointed by the mayor); *Hudson v. Burke*, 913 F. 2d 427 (7th Cir. 1990)(the finance committee investigators were policymakers because their primary qualifications to work for the finance committee were political connections).

Here, Plaintiff's role was entirely passive compared to the plaintiffs in the above cases. Her main role was providing accurate numbers and calculations in accordance with the Board Chairman's direction. Plaintiff had to change the numbers as the Chairman or the County Board directed. (PSAF ¶¶ 2 and11-14).

Further, Ms. Bogart was not able to either spend or issue checks, or to reconcile the County account without the authorization of the Auditor, Treasurer, or County Chairman (PSAF ¶5,7,8, 9and 21-26). The evidence clearly shows that Plaintiff did not even have access to the basic account information (such as the balance in the County accounts), and would not know of any overdrafts of  accounts unless she was notified by the Treasurer or Auditor. *Id.* Given Plaintiff's limited access to the County's account information and funds, it would be absurd to argue that

she controlled the County's budgets, or had significant input in the County's budgetary or financial policies.

Additionally, the fact that one of the alleged reasons Defendants terminated Plaintiff was insubordination (PASF ¶ 20) defeats Defendants' argument that she was granted broad discretion. *Embry v. City of Calumet City, Ill*., 701 F.3d 231, 236 (7th Cir. 2012) (holding that discretion is also important in determining whether a government employee holds a policymaking position because when an employee exercises broad discretionary power, the state cannot easily fire the employee for insubordination even though the employee's performance frustrates the implementation of the administration's policies).

It should be also noted that while Defendants mentioned Seventh Circuit case where it recognized a "small office exception" to the First Amendment protection from patronage firings, this argument is an affirmative defense. It was never raised over the course of this litigation and there was no discovery done with this issue and it was neither developed nor supported by evidence in the record. Defendants fail to put forth any evidence showing that Defendant Marron regarded Ms. Bogart as a "political enemy" and that he was required to work in constant direct contact with Ms. Bogart whom he viewed as a political opponent. Accordingly, this argument should be disregarded by this Court.

In sum, there is no evidence to support that the Financial Resource Director was a policymaker position as a matter of law under the *Elrod-Branti* framework. Defendants failed to meet the high burden to prove that political affiliation was a qualification. At most, Defendants' argument that

Financial Resource Director is a policy making position raises a factual dispute that should be resolved by the jury.  Defendants' Motion for Summary Judgment should be denied.


**IV.** **County's personnel policy banning political patronage practice is relevant to evaluate the FRD position.**

Defendants' argument that the County's Personnel policy banning patronage practice does not negate the application of the *Elrod-Branti* doctrine should fail for several reasons.

First of all, Plaintiff is not arguing that Article 14 of the County's Personnel Policies should trump First Amendment precedents as Defendants attempt to argue. Plaintiff's position is that Article 14, which prohibits coercion or discrimination on the basis of political affiliation or participation, constitutes factual evidence that sheds light on the nature of Plaintiff's job, and more specifically, whether the "nature of [her] job makes political loyalty a valid qualification". *Fuerst v. Clarke*, 454 F.3d 770, 773 (7th Cir. 2006).


As discussed above, the job description of the FRD position does not clearly establish that political affiliation is a requirement for the position. Accordingly, the Court and jury need to look at additional evidence in order to determine the nature of the position, and the personnel policy should be on part of that additional evidence. *See Pleva v. Norquist*, 195 F. 3d 905 at 912 (7th Cir. 1999).


In the *Fuerst* opinion, the Seventh Circuit held that it was an error for the district court to find that the sergeant's position was a policymaking one, and that the sergeants' statuses as policymakers was not so clear that the issue could be resolved on summary judgment. *Id*. at 773.

The *Fuerst* Court goes on to note that Wisconsin had passed a law which prohibited the curtailment of (off duty) political activities for police officers, and banned discrimination on that basis. Such a law, the Court explains, "makes clear that sergeants are not expected to be political loyalists of the sheriff". *Id*. But perhaps most saliently, the Court takes care to distinguish and explain that Wisconsin's anti-patronage law is relevant to Fuerst's appeal not because the statutory provisions confer legally enforceable rights on him (an issue not before the Court), **but because they cast additional light on the nature of the sergeant's job**. *Id*. The Court goes on to conclude that **the provisions, in effect, amend the job description**. *Id* (citations omitted).

Like the political protection statute in the *Fuerst* case, in this case Article 14 also casts light on the nature of Plaintiff's position as the Financial Resources Director for Vermillion County, and whether or not the nature of her job makes political loyalty a valid qualification. Illinois also has a political protection statute similar in purpose to the Wisconsin statute mentioned in *Fuerst*, the Illinois Local Government Employees Political Rights Act ("LGPRA"), which is one of the claims in the instant case as well. Article 14, especially when viewed along with the Illinois statute, conveys a significant amount of understanding about the nature of Plaintiff's job as a local government employee and an employee of Vermillion county. Actually, the argument that the Personnel Policies Manual sheds light on the nature of Plaintiff's job position has already been conceded by Defendants- they rely on the very same manual  to support their arguments about the contractual/at-will nature of Plaintiff's job.

Article 14 is also relevant because it is an employer's policy which the employer ignored or violated when it terminated Plaintiff. Its existence may also explain any shifting reasons or

explanations given by the employer for Plaintiff's termination. Both of these situations give rise to an inference of pretext for the termination. The Seventh Circuit has held that pretext can be inferred from inaccuracies or inconsistencies in the employer's proffered reason for termination, selective enforcement of a policy, or when the employer violates its own policies. *Baker v. Macon Resources*, *Inc.*, 750 F.3d 674, 677-678 (7th Cir. 2014); *Rudin v. Lincoln Land Community College,* 420 F.3d 712, 727 (7th Cir. 2005); *Huff v. UARCO, Inc.,* 122 F.3d 374, 380-82 (7th Cir. 1997). Similarly, when an employer has a written policy and then relies on a rule for which there is no written documentation, that deviation may support an inference of pretext. *See, e.g., Giacoletto v. Amax Zinc Co., Inc*., 954 F.2d 424, 427 (7th Cir.1992); *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 727 (7th Cir. 2005).

Secondly, Defendants' reliance on the line of case law that excludes internal policy as evidence of the constitutional violation is completely inapposite. These cases all involve §1983 claims brought by civilians against police departments for the use of excessive force. This case involves a County personnel policy banning adverse employment action against employees based on political patronage and an employee who alleges an adverse employment action based on political patronage. There may not be a connection between civilians and internal police policies, but there is certainly a connection between internal policies and the employees goverened by those policies. In fact, even in the cases where the Court excluded the internal policies or rules of the police as irrelevant evidence with respect to civilians, the Seventh Circuit explained that evidence, testimony, or argument concerning possible violations of General Orders, rules, or regulations may be relevant to "discipline, promotion, or salary decisions" made by the police officers' superiors. *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006).

Therefore, Article 14 of the County Personnel Policies should be considered as additional evidence in deciding whether political affiliation was a legitimate requirement for Plaintiff's position.

**V.      Defendant Marron is not entitled to qualified immunity.**

The cloak of qualified immunity is removed from a government official if the plaintiff shows that the law prohibiting the government official's conduct was "clearly established." *Gregorich v. Lund*, 54 F. 3d 410, 413 (7th Cir. 1995). The test for whether the law was clearly established must be conducted based on the specific facts of the case, and not a high level of generality. A plaintiff is not required to find a factually indistinguishable case on point, but if there is no such case, he needs to offer a different explanation for why the constitutional violation is obvious. *Moss v. Martin*, 614 F. 3d 707, 712 (7th Cir. 2010).

Here, as discussed extensively above, political affiliation is not a requirement for the FRD position. It is well established that public employees cannot be terminated based on their political belief both under the U.S. and Illinois constitution. Defendant Marron, through holding many elected official positions and working with Ms. Bogart prior to his Board Chairmanship, would have understood that the position does not require political loyalty (PSAF ¶¶ 33-35). Further, he testified that he was familiar with the County Personnel policy which bans political patronage termination. And perhaps most tellingly, he testified that ***he knew that terminating a public employee for running for a political office is unlawful***. *Id*.

Accordingly, Defendant Marron is not entitled to qualified immunity.

## **CONCLUSION**

For the reason stated above, Plaintiff Nikki Bogart, respectfully requests that this Court DENY

Defendants' Motion for Summary Judgment.


                                                Respectfully Submitted,
                                                Nikki Bogart

                                                By: /s/ Kevin F. O'Connor
                                                One of her attorneys

Kevin F. O'Connor (ARDC #6300449)
O'Connor |O'Connor, P.C.
110 E. Schiller St., Ste 312
Elmhurst, IL 60126
Office 630-456-1596
Fax. 630-658-0336
kevin@oconnor-oconnor.com

## CERTIFICATE OF SERVICE

I hereby certify that on **January 11**, 2018 I electronically filed the foregoing ***Plaintiff's Response in Opposition to Defendants' Summary Judgment*** with the Clerk of the U.S. District Court for the Central District of Illinois, Peoria Division, using the CM/ECF system, which will send notification to the CM/ECF participants:

s/ Kevin F. O'Connor

### SERVICE LIST

Michael W Condon      mcondon@hcbattorneys.com, vgiordano@hcbattorneys.com

Yordana Wysocki      ywysocki@hcbattorneys.com, wdihu@hcbattorneys.com